HEALY-OWEN-HARTZELL CO., Appellant, v. BONILLA EQUITY EXCHANGE, et al, Respondents.

(219 N. W. 791.)

(File No. 5864.   Opinion filed June 4, 1928.)

*Corrigan & Walton,* of Aberdeen, and *H. V. Mercer,* of Minneapolis, for Appellant.

*Gardner & Churchill,* of Huron, for Respondents.

MISER, C. Plaintiff and appellant is a grain commission firm. The defendants are, first, Bonilla Equity Exchange, and, second, four individuals who, at the time of the transactions here involved, were directors of the elevator company. The suit is for money claimed to be owing on the agreement hereinafter set out. On trial in circuit court the plaintiff recovered judgment for the full amount of its claim against the defendant Bonilla Equity Exchange, in which judgment it was further decreed that the plaintiff has a lien in the nature of a chattel mortgage upon the elevator property, and that said lien be foreclosed. No appeal has been taken from that part of the judgment which affects the defendant Bonilla Equity Exchange; but this appeal is from that part of the judgment wherein it was ordered that the plaintiff take nothing against the four individual defendants, respondents herein, whose contention that they signed the contract in their capacity as directors of the Bonilla Equity Exchange in order to give validity to said instrument as a lien in favor of plaintiff upon the elevator and contents, and not as individuals, was found to be true by the trial court. The contract is as follows:

"Mutual Contract.

"The signers hereof, in consideration of the promises and agreements herein, promise and agree:

"That HEALY-OWEN-HARTZELL COMPANY, hereafter called commission merchant, will advance money and otherwise give credit to BONILLA EQUITY EXCHANGE, owner and operator of a grain elevator at BONILLA, S. D., county of Beadle, state of South Dakota, hereinafter called elevator company, from time to time, during the life of this contract, as said commission

merchant may deem necessary or advisable. That said elevator company shall, during the continuance of this contract and of any indebtedness to the commission merchant, consign and ship to the commission merchant for sale by it, * * * 100 per cent of all grain purchased by the elevator company and shipped from its said elevator, and shall pay on all transactions the current commissions and charges according to the rules of the exchange where the grain is bought or sold, and the commission merchant may make sales or purchases of grain in its name for the elevator company, according to the usages, customs, and regulations of such grain exchanges.

"That the commission merchant will receive all grain consigned to it by the elevator company, and will use its best efforts to sell the same at the best prices possible, and shall promptly render confirmations and account of sales therefor and the monthly statement of the account sent the elevator company, showing the amount due the commission merchant up to the first of the month, shall constitute an account stated, unless such statement is promptly returned with objections stated thereon to the commission merchant. That the advances to the elevator company, and the indebtedness to the commission merchant, shall draw interest to be computed on daily balances, at such rate as they may agree from time to time; that the manager of the elevator company acts for and on behalf of such company and its directors, in drawing drafts, and in giving all orders for the buying or selling of either cash grain or futures, and in all transactions with the commission merchant; that the elevator company will ship out all grain as fast as convenient, to reduce its indebtedness to the commission merchant, and the commission merchant is hereby given a lien on said elevator and all grain purchased by the elevator company, as security for all indebtedness to the commission merchant; and the elevator company shall keep the elevator and all grain therein fully insured, with a clause attached to the policies providing that the loss, if any, be payable to the commission merchant as its interest may appear.

"This agreement shall remain in force from year to year, but may be terminated at will by the commission merchant, and by all of the other parties hereto giving notice in writing to that effect to the commission merchant and paying all indebtedness to it. That the commission merchant objects to the use of its money for

anything except the purchase of grain for consignment to it, and the parties and signers hereto, except the commission merchant, jointly and severally, in consideration of the commission merchant making advances and giving credit to the elevator company, promise and agree to pay the commission merchant on demand all advances made by it to the elevator company and all other indebtedness of the elevator company to the commission merchant, notwithstanding notes or securities held by the commission merchant, and cost of collection, and agrees that the advances made the elevator company for the purchase and consignment of grain to the commission merchant shall not, without its consent, be used other than for the purchase of grain to be consigned to the commission merchant, and that it shall not be necessary for the commission merchant to notify any of the parties hereto of the acceptance of this agreement or of any default, other than to give the elevator company a copy of this agreement, and the elevator company hereby acknowledges receipt of copy of the same.

"Dated this 12th day of November, 1920. HEALY-OWEN-HARTZELL CO., by A. Owen, President. R. J. Healy, Secretary. Witnesses: M. Graham. G. Rothstein. BONILLA EQUITY EXCHANGE, by Louis Schnetzer, President. John C. Meyer, Secretary pro tem. Witnesses: H. M. Jones. James Bales. [Corporate Seal of Bonilla Equity Exchange.] Louis Schnetzer. John C. Meyer. Wm. Radtke. J. J. Miller. [Corporate Seal of Healy-Owen-Hartzell Co.]"

The court also found: That, on said 12th day of November, 1920, Bonilla Equity Exchange was indebted to plaintiff, on account of money advanced, in the sum of about $55,000, on open account, for which plaintiff held no security, and that the value of the grain in the elevator and the elevator property itself was in excess of $55,000. That, after the above contract had been signed by plaintiff and by Bonilla Equity Exchange, by its president and secretary, and within a few days thereafter, a traveling solicitor of plaintiff returned to the elevator building, where a meeting of the directors of the elevator company was held in its office. At this meeting of the board of directors the traveling solicitor and plaintiff stated to respondents that he had been sent there to have the board sign said mutual contract, whereupon respondents signed the contract. That thereafter all the contents of the elevator was

delivered to plaintiff and the proceeds credited on the indebtedness of the defendant Bonilla Equity Exchange. That from time to time plaintiff made further loans to the elevator company; and, after crediting the elevator company with the proceeds of grain sold by plaintiff for it, the elevator company remains indebted to the plaintiff: in the sum of $28,161.48, for which amount plaintiff obtained judgment against the elevator company, which decree authorized the foreclosure of a lien of that amount against the elevator property. The lien was subsequently foreclosed and deficiency judgment taken against the elevator company, from which the elevator company makes no appeal.

The fourth finding of fact is as follows:

"That the said A. Owen, as president of the plaintiff company, in his conversation with the defendants Schnetzer and Meyer, and the said Robert Hannah, acting on behalf of plaintiff, in his statements made at said directors' meeting, at no time stated or intimated to the defendants Schnetzer, Meyer, Radtke, and Miller that the plaintiff desired to have said four individual defendants execute said mutual contract as sureties for the defendant Bonilla Eyuity Exchange or to assume any personal liability on account of indebtedness of Bonilla Equity Exchange to plaintiff, but at all times stated and represented that the plaintiff desired security for the indebtedness due it from defendant Bonilla Equity Exchange upon the elevator of said Bonilla Equity Exchange and its contents, and the defendants Schnetzer, Meyer, Radtke, and Miller were induced by said statements and representations and by the form of said mutual contract prepared by plaintiff and presented to them under said circumstances to believe that they were signing said mutual contract in their capacity as directors of the defendant Bonilla Equity Exchange in order to give validity and effect to said instrument as a lien in favor of plaintiff upon the elevator and contents of the defendant Bonilla Equity Exchange, and not as individuals. If said mutual contract is construed as a contract executed by the defendants Schnetzer, Meyer, Radtke, and Miller individually as guarantors or sureties of indebtedness of Bonilla Equity Exchange to plaintiff, then the representations aforesaid by which such signatures were secured amounted to a fraud upon the defendants Schnetzer, Meyer, Radtke, and Miller, and said individual defendants are not bound thereby."

We have set forth the contract in full, and refrain from stating those special phrases and clauses upon which respondents' liability is based, if, as appellant contends, respondents be liable as sureties. Only by examining the contract as a whole can it be determined whether or not this affords a proper occasion for admitting parol evidence to explain a writing. Appellant contends that the contract is a plain, clear, unambiguous promise of guaranty of the debt of Bonilla Equity Exchange by four individuals. Respondents contend, first, that they signed the contract as directors of Equity Exchange to give validity and effect to the lien on the elevator and its contents; or, second, if the instrument so signed by them was of a different purport, they were entrapped by the fraud and design of plaintiff into signing it. Respondents were permitted, over appellant's objection, to introduce parol evidence in support of their contentions.

Parol evidence is admissible to explain writings under the following rule:

"Extrinsic evidence is often received, where there is uncertainty and latent ambiguity, to show the capacity in which a person acts, the real relation of parties to a writing, and that persons not named therein are in fact interested, provided the terms of the instrument are not otherwise varied. Any doubt or ambiguity on the face of the instrument as to the capacity in which one signing intended to bind himself, if at all, may be resolved by parol evidence as to the cricumstances surrounding his signature." Jones on Evidence (2d Ed.) [Henderson 1926 Ed.] § 1556, citing, inter alia, Byrum v. Dilts, 44 S. D. 318, 183 N. W. 974.

In an earlier decision this court said:

"While as a general rule, parol evidence is not admissible to vary or explain the terms of a written instrument, our statute makes a well-defined exception, and the doctrine seems well established that parol evidence is admissible, as between original parties, when something on the face of the writing creates a doubt as to the parties obligated, and the recitals of the instrument are such that the court cannot by inspection determine the question as a matter of law." Miller v. Way, 5 S. D. 468, 472, 59 N. W. 467, citing sections 3554, 3562, 3564, Compiled Laws, now sections 869, 877, 879, R. C. 1919.

See, also, Pearson v. Post, 2 Dak. 220, 249, 9 N. W. 684; Osborne & Co. v. Stringham, 1 S. D. 406, 411, 412, 47 N. W. 408, 410.

It therefore seems to be established in this state that any doubt or ambiguity on the face of the instrument as to the capacity in which one signing intended to bind himself, if at all, may be resolved by parol evidence as to the circumstances surrounding his signature.

Does such a doubt or ambiguity appear upon the face of the instrument in question? An inspection of the contract discloses that the names of the four respondents nowhere appear in the body of the instrument. In striking contrast appears, with all the force of double-spaced lines and ten-point capitals, the name of Healy-Owen-Hartzell Company, and, plainly stamped in blanks left for that purpose, the name of Bonilla Equity Exchange; all this in a printed contract form prepared by plaintiff which clearly binds the elevator company to ship to the commission merchant the 30,000 bushels of grain then in storage and to ship all grain thereafter purchased with moneys advanced by the commission merchant, and which clearly gives to the commission merchant a lien on said elevator and all grain purchased by the elevator company as security for all indebtedness due the commission merchant.

Would such an instrument be valid to create a lien on all the tangible assets of the elevator company for the security of past-due debt if merely signed by its president and secretary pro tem? Appellants, relying on section 545, R. C. 1919, and Kessel v. Murray, 197 Iowa, 17, 196 N. W. 591, 33 A. L. R. 1346, contend that the signatures of respondents were not necessary to the validity of such a lien. However, in T. E. Wells & Co. v. Sharp (C. C. A.) 208 F. 393, an appeal from the district court of this state, also involving a chattel mortgage on two elevators, the court said:

"The mortgaging of property to secure a past-due indebtedness is certainly not an act done in the usual course of current business. It is a first step to what generally terminates in bankruptcy and destruction of the business. We cannot give our assent to the exercise of such potentially destructive power by a chief executive officer of a business corporation without authority of the board of directors or stockholders themselves. The leading case on this subject in South Dakota, Des Moines M. & S. Co. v.

Tilford M. Co. et al, 9 S. D. 542, 70 N. W. 839, puts a construction upon the statutes of that state above referred to quite inconsistent with the contentions of counsel for appellant, and in entire harmony with the conclusions we have reached."

While it is true that, in the closing paragraph of the contract, occurs language which, if standing alone, or if uninfluenced by other parts of the contract, would be sufficient to state a liability on the part of respondents as individual guarantors or sureties, it seems none the less obvious, when read in its entirety, that doubt and ambiguity does appear upon the face of the instrument as to the capacity in which respondents intended to bind themselves. Therefore, parol evidence as to the circumstances surrounding their signatures was admissible; for we have here no simple instrument such as a promissory note whose legal intendments are well established, but a contract between the elevator company and the commission merchant, a lien on all the property of the elevator company to the commission merchant, and a claim that, in addition thereto, there was a guaranty. This claim respondents seek to combat with testimony that, at the request of plaintiff's traveling solicitor, a directors' meeting was had for the express purpose of giving validity to the lien upon the elevator property, and for that purpose only did they sign.

While the evidence as to the circumstances surrounding their signature was conflicting, it amply supported the findings made by the trial court; and, inasmuch as the court found that respondents signed said instrument only in order to give validity and effect to said instrument as a lien, no useful purpose would be served by considering whether the representations made to secure such signatures did or did not amount to a fraud. Finding no error in the record, the judgment and order appealed from are affirmed.

POLLEY, SHERWOOD, CAMPBELL, and BROWN, JJ., concur.

BURCH, P. J., dissents, being of the opinion that there is no ambiguity on the face of the contract warranting the receipt of oral evidence.